**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**RURAL ELECTRIC COMPANY, Inc., Respondent.**

**No. 6715.**

United States Court of Appeals
Tenth Circuit.

Oct. 28, 1961.

524

Glen Bendixsen, Washington, D. C. (Stuart Rothman, Dominick L. Manoli, Marcel Mallet-Prevost, Frederick U. Reel, and Julius G. Getman, Washington, D. C., on the brief), for petitioner.

Warren L. Tomlinson, Denver, Colo. (Loomis, Lazear & Wilson, James O. Wilson, Cheyenne, Wyo., Holland & Hart, and John Carroll Richardson, Denver, Colo., on the brief), for respondent.

Before BRATTON, PICKETT, and HILL, Circuit Judges.

BRATTON, Circuit Judge.

This proceeding tests the validity of an order of the National Labor Relations Board. Local Union 415, International Brotherhood of Electrical Workers, hereinafter referred to as the Union, initiated the proceeding before the Board. In its amended pleading, the Union pleaded that it was the duly designated collective bargaining representative of Rural Electric Company, hereinafter referred to as the Company; charged that the Company failed and refused on request to recognize and bargain collectively with the Union; charged that the Company kept its employees under surveillance during meetings at which such employees considered whether they should establish or continue a union; charged that the Company threatened its employees with loss of employment and other reprisals if they became or remained members of the Union; charged that the Company of-fered its employees rewards and benefits to refrain from union activities; and granted unilateral wage increases to its employees. A trial examiner conducted hearings and made findings of fact. The Board determined in effect that the Company had been guilty of all of the unfair labor practices charged; and the Board entered a conventional order requiring the Company to cease and desist from such practices. The proceeding is here on petition of the Board for an order of enforcement.

The determination of the Board that the Company committed an unfair labor practice by refusing to bargain collectively with the Union is challenged. Under section 8(a) (5) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 158(a) (5), the refusal of an employer coming within the purview of the Act to bargain collectively with the duly selected collective bargaining representative of the employees of such employer constitutes an unfair labor practice. But the duty of an employer to recognize and bargain collectively with a union as the collective bargaining representative of employees does not arise until after the union requests the employer to bargain. In other words an employer is not in default respecting the duty to bargain until a request therefor has been made. National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660; Atlas Life Insurance Co. v. National Labor Relations Board, 10 Cir., 195 F.2d 136. It is not essential to the validity of a request to bargain that it be in writing. And no particular form is required. It suffices if the union makes it fairly clear that the employer is being requested to bargain. Joy Silk Mills v. National Labor Relations Board, 87 U.S.App.D.C. 360, 185 F.2d 732, certiorari denied 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350; National Labor Relations Board v. Burton-Dixie Corp., 10 Cir., 210 F.2d 199. But ordinarily, in order to constitute an unfair labor practice for refusal to bargain, there must be a fairly clear request to bargain and a fairly

clear refusal of such request. National Labor Relations Board v. Burton-Dixie Corp., supra.

■ The only evidence adduced in respect to contact or communication between the Union and the Company in respect to bargaining was given by Norman R. Dean, then business manager for the Union at Cheyenne, Wyoming, and B. E. Lyons, manager of the Company at Pine Bluffs, Wyoming. Dean testified in substance that he called Lyons on the telephone; that he told Lyons who he was; that he was requesting recognition as the bargaining agent or representative of the outside employees of the Company; that a majority of the employees had asked the Union to represent them; that he asked for recognition; that Lyons was either confused or upset, or something; that a direct answer could not be obtained from him; that finally Lyons was asked if he would object to the Union representing the employees; and that he said he would object. He further testified that the conversation was very short; that one of his purposes in talking with Lyons was to establish a demand and refusal as a preliminary step to the filing with the National Labor Relations Board of a petition for an election to determine whether the employees desired to be represented by the Union; and that the petition for election was filled out and filed with the Board. Lyons testified that he received a telephone call; that the speaker said he would like to meet with Lyons to bargain for some of the employees; that Lyons responded by saying that it came out of a blue sky, or something like that; that the speaker said he was Norman Dean of the IBEW and would like to meet with Lyons to negotiate for some of the Company's employees; that Lyons supposed he stuttered or stammered and said that he didn't think so; that the speaker then asked Lyons if his answer was no; and that Lyons replied by saying that under the circumstances he supposed it would have to be considered that way. The Company was a small enterprise located in a rural area; it distributed electric energy to some small towns and about eighteen hundred farmers and ranchers located in Wyoming, Nebraska, and Colorado; its directors were farmers and ranchers; and it had about twenty employees, the majority of whom were linemen and groundmen. The employees had not previously been represented by a union, and Lyons was without experience in dealing with questions relating to union representation. At the time of the conversation between Dean and Lyons, the latter did not know of any union activities. Dean intended and purposed that the conversation should lay the basis for a petition to the National Labor Relations Board to call and conduct an election among the employees to determine their desire in respect to the Union representing them as their bargaining agent. Lyons' answer was evasive. It was not positive and unequivocal. Dean did not endeavor to communicate later with Lyons and Lyons did not tell anyone connected with the Company about the conversation. The evidence was not sufficient to support the finding that the Company refused to bargain and for that reason was guilty of an unfair labor practice.

■ Section 7 of the Act, 29 U.S.C.A. § 157, provides in substance that employees shall have the right to form, join or assist labor organizations; to bargain collectively; and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; and section 8(a) (1) provides that it shall be an unfair labor practice to restrain or coerce employees in the exercise of the rights guaranteed by section 7. The findings of the Board that the Company was guilty of unfair labor practices by interfering with the rights of the employees guaranteed by section 7 is challenged on the ground that they are not sustained by the evidence. While there were some conflicts in the evidence, testimony was adduced which tended to establish these facts and circumstances. On Monday, March 21, 1960, cards signed by a majority of the construction and maintenance employees

of the Company designating the Union as their collective bargaining representative were placed in the hands of Dean. Among such cards were cards signed by Earnest F. Fitzgerald, line superintendent for the Company, and James K. Thompson, electrification advisor. Dean immediately called Lyons on the phone; and the two of them had the conversation to which reference has been made. On Thursday, the Company received a copy of the petition for election. The president of the Company and Lyons sought legal advice and were advised not to discuss wage increases or take other steps while the petition was pending. Two meetings of employees were held at the home of an employee, one on Wednesday evening, March 23, and the other on Thursday evening, March 24. Fitzgerald attended both meetings and Thompson attended the last one. The purpose of the meetings was to determine whether the employees should designate the Union as their bargaining representative or deal directly with the Company. No officer of the Company knew in advance that Fitzgerald had signed a union card or that he would attend the meetings. One director knew Thursday afternoon that Thompson was going to attend and suggested that he find out what the men wanted and that they give the board of directors of the Company first chance, manifestly meaning the first chance to meet their request. On the same day, Lyons told Thompson that Thompson's job would be abolished if the men went union. Thompson told the employees at the meeting of his conversation with the director. No decision was reached at the first meeting. At the second meeting, Fitzgerald submitted a written scale of proposed wages which he prepared; Fitzgerald and Thompson urged the employees to give the Company a chance to meet their salary demands without the intervention of the Union; the employees agreed to do that; and Thompson was chosen to present to the directors the schedule of wages which Fitzgerald had prepared. On Friday, Thompson discussed with the director with whom he had previously been in contact the proposals of the employees; and on Saturday, he met with the president and three directors of the Company. In the course of the meeting, he produced and handed the schedule of wages to one of the directors. The president declined to discuss the matter, but one of the directors stated that he did not see why the Company could not meet the schedule, and another director said that he did not think the employees would get that amount if they did go union. Thompson went to the home of Fitzgerald. Fitzgerald and other employees were there. Thompson told them that the president of the Company had refused to discuss the wage matter, and that the Company could meet the wage scale if the Union were abandoned. Fitzgerald telephoned a director and requested a meeting with some of the directors. The meeting was held Sunday. At the meeting, Fitzgerald reported that the men had changed their minds, and that he did not think they were interested in the Union. On Monday, Fitzgerald told a group of employees that in his opinion the directors would give the employees a "fair shake" and advised that they be given a chance to do so. He further suggested that some employees go to the union hall in Cheyenne and ask the Union to withdraw the representation petition. Using company vehicles, some employees went to a point or points near Cheyenne in connection with their work on company lines; and on company time, they went from such point or points to the office of the Union and sought to have the representation petition withdrawn; but Dean declined to permit its withdrawal. At a meeting of the directors of the Company in March the matter of wage adjustments or increases was discussed but no action taken; and at the meeting in April no action was taken. Prior to the meeting of the directors in May, the Company received notice that the petition for the representation election had been withdrawn from the Board. The board of directors of the Company at their meeting in May granted the employees substantial increases in wages

without notice to or consultation with the Union. When the evidence, together with the inferences fairly to be drawn from it, is viewed in its entirety, we think that there was basis for the findings and conclusion of the Board that the Company interfered with the rights of the employees under section 7, and that such interference constituted unfair labor practices.

Enforcement of that part of the order requiring the Company to bargain collectively will be denied. In all other respects, the order will be enforced.